[Cite as *State v. Wilson*, 2011-Ohio-4651.]

**[Please see nunc pro tunc opinion at 2011-Ohio-5371.]**

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. William B. Hoffman, P.J. |
|     Plaintiff-Appellant | Hon. Sheila G. Farmer, J.<br>Hon. Julie A. Edwards, J. |
| -vs- | |
| SHANE WILSON | Case No. 11-CA-20 |
|     Defendant-Appellee | O P I N I O N |

CHARACTER OF PROCEEDING:    Appeal from the Newark Municipal Court,
Case No. 10TRC09710

JUDGMENT:                  Reversed and Remanded

DATE OF JUDGMENT ENTRY:    September 13, 2011

APPEARANCES:

For Plaintiff-Appellant

TRICIA M. MOORE
Assistant Law Director
40 W. Main Street
Newark, OH 43055

For Defendant-Appellee

DAVID B. STOKES
21 W. Church Street
Suite 206
Newark, OH 43055

*Hoffman, P.J.*

{¶1} Plaintiff-appellant State of Ohio appeals the February 11, 2011 Judgment Entry entered by the Licking County Court of Common Pleas granting Defendant-appellee Shane Wilson's motion to suppress.

STATEMENT OF THE FACTS AND CASE

{¶2} On October 10, 2010, officers were dispatched to the scene of an accident on State Route 79. Ohio State Trooper Thaxton testified he responded to a head on crash with severe damage to several vehicles involved in the accident. Approximately four people were transported to the hospital as a result of injuries sustained in the accident.

{¶3} A Chevy Blazer, later determined to belong to Appellee, was found at the scene with extensive damage. Ohio State Highway Patrol Trooper Thaxton testified there was "quite a bit of blood" on the interior of the driver compartment and on the door pillar. The windshield was broken and there was heavy damage to the left front quarter panel. Appellee was not at the scene of the accident.

{¶4} State Highway Patrol Trooper Shawn Eitel left the scene of the accident and proceeded to Appellee's residential address. Upon arriving at the residence, Trooper Eitel met up with Deputy Dirk Williamson of the Licking County Sheriff's Office. Prior to Trooper Eitel's arrival, Deputy Williamson made multiple attempts to get someone to come to the door of the residence, but was unsuccessful.

{¶5} Trooper Eitel testified he noticed a key in the door and a sliver of blood on the door handle. Trooper Eitel and Deputy Williamson decided to enter the home to make certain the person involved in the accident did not need medical care. The door

to the residence was unlocked with the key in the lock.  As the officers opened the door, they announced their presence and called out for Appellee, but no one responded. They eventually found Appellee in a back bedroom, asleep or passed out on the bed. They observed injuries to Appellee's head and arm.  Once awake and walking, the officers smelled a strong odor of alcohol on Appellee and observed Appellee had difficulty walking.

{¶6}   Subsequently, Appellee was cited for operating a motor vehicle while under the influence of alcohol.  On October 26, 2010, Appellee filed a motion to suppress arguing the State failed to demonstrate exigent circumstances justifying the warrantless entry into his home.  On January 10, 2011, the trial court denied the motion finding exigent circumstances existed to justify the officers' warrantless entry into the residence.

{¶7}   On January 28, 2011, Appellee filed a motion to reconsider.  On February 11, 2011, the trial court issued a second entry granting the motion to suppress finding exigent circumstances did not exist to justify the warrantless entry into the home.

{¶8}   The State of Ohio now appeals[1], assigning as error:

{¶9}   "I. THE TRIAL COURT ERRED IN GRANTING THE DEFENDANT'S MOTION TO SUPPRESS THE WARRANTLESS ENTRY INTO THE APPELLEE'S HOME BASED ON EXIGENT CIRCUMSTANCE."

{¶10} Appellate review of a trial court's decision to grant a motion to suppress involves a mixed question of law and fact. *State v. Long* (1998), 127 Ohio App.3d 328,

---

[1] Appellee asserts the State of Ohio failed to comply with Ohio Criminal Rule 12(K) when filing the within appeal.  Specifically, Appellee maintains the State did not file the certification required by the rule.  Upon review, the record reflects the State filed the Certification of the Prosecuting Attorney on February 18, 2011, in the trial court docket.

713 N.E.2d 1. During a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to resolve questions of fact and to evaluate witness credibility. *State v. Brooks,* (1996), 75 Ohio St.3d 148, 661 N.E.2d 1030. A reviewing court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Metcalf* (1996), 111 Ohio App.3d 142, 675 N.E.2d 1268. Accepting these facts as true, the appellate court must independently determine as a matter of law, without deference to the trial court's conclusion, whether the trial court's decision meets the applicable legal standard. *State v. Williams* (1993), 86 Ohio App.3d 37, 619 N.E.2d 1141.

{¶11} There are three methods of challenging a trial court's ruling on a motion to suppress on appeal. First, an appellant may challenge the trial court's finding of fact. In reviewing a challenge of this nature, an appellate court must determine whether the trial court's findings of fact are against the manifest weight of the evidence. See *State v. Fanning* (1982), 1 Ohio St.3d 19, 1 Ohio B. 57, 437 N.E.2d 583; and *State v. Klein* (1991), 73 Ohio App.3d 486, 597 N.E.2d 1141. Second, an appellant may argue that the trial court failed to apply the appropriate test or correct law to the findings of fact. In that case, an appellate court can reverse the trial court for committing an error of law. See *State v. Williams* (1993), 86 Ohio App.3d 37, 619 N.E.2d 1141. Finally, an appellant may argue the trial court has incorrectly decided the ultimate or final issues raised in a motion to suppress. When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. *State v. Curry* (1994), 95 Ohio App.3d 623, 620 N .E.2d 906.

{¶12} This Court recently addressed the issue raised herein in *State v. Bethel* Tuscarawas App. No. 10-AP-35, 2011-Ohio-3020, holding:

{¶13} "The Fourth Amendment of the Constitution of the United States guarantees each citizen a right to be free from unreasonable governmental intrusions. Specifically, it states:

{¶14} "'The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'

{¶15} "'The Fourth Amendment's prohibition against unreasonable searches and seizures has always been interpreted to prevent a search that is not limited to the particularly described 'place to be searched, and the persons or things to be seized,' U.S. Const., Amend. IV, even if the search is made pursuant to a warrant and based upon probable cause." *Florida v. Royer* (1983), 460 U .S. 491, 499, 103 S.Ct. 1319.

{¶16} "The predicate for permitting seizures on suspicion short of probable cause 'is that law enforcement interests warrant a limited intrusion on the personal security of the suspect. The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.' *Id.,* at 500, citing, e.g., *United States v. Brignoni–*

*Ponce,* 422 U.S., at 881–882, 95 S.Ct., at 2580–2581; *Adams v. Williams,* 407 U.S., at 146, 92 S.Ct., at 1923.

**{¶17}** "It is the State's burden to demonstrate that the seizure it seeks to justify was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.

**{¶18}** "* * *

**{¶19}** "An exception to the warrant requirement of the Fourth Amendment involves exigent circumstances. Exigent circumstances are synonymous with an emergency, whether it is actual or ongoing. *Mincey v. Arizona* (1978), 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290. In *State v. Hyde* (1971), 26 Ohio App.2d 32, 34, 268 N.E.2d 820, the Ninth District Court of Appeals explained the following:

**{¶20}** " 'The right of the police to enter and investigate in an emergency without accompanying intent to either search or arrest is inherent in the very nature of their duties as peace officers. * * *.' *United States v. Barone* (C.C.A.2), 330 F.2d 543, at 545.

**{¶21}** "'Breaking into a home by force is not illegal if it is reasonable in the circumstances.' 'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent exigency or emergency.' *State v. Burgess* (Nov. 4, 1999), 5th Dist No. 99–CA–0035, quoting *Wayne v. United States* (D.C.Cir.), 318 F.2d 205, at 212. See also, *State v. Oliver,* 91 Ohio App.3d 607, 632 N.E.2d 1382.

**{¶22}** "In the treatise, 'Ohio Arrest, Search and Seizure' (1999 Ed.), Professor Lewis Katz discussed the scope of an emergency search at 185–286, Section 10.5, as follows:

**{¶23}** "'Exigent circumstances create justification for limited warrantless searches. The duration of the intrusion and the scope of the search are governed by the constitutional command of reasonableness, which will be evaluated in terms of the emergency. Once the emergency conditions have been alleviated, further intrusion must be sanctioned by a warrant. Any other interpretation of the emergency exception would create another general exception that would swallow the Fourth Amendment principle that warrantless intrusions are per se unreasonable. Furthermore, searches that extend beyond the scope of the actual emergency lead to an inference that the emergency is serving as a pretext to conduct a warrantless search.' (Footnotes omitted.)"

**{¶24}** In the case herein, Trooper Eitel testified he observed a lot of damage to the Chevy Blazer sustained in the accident.  He testified there was a lot of blood around the driver's door and around the driver's area.  Tr. at 7.

**{¶25}** Trooper Eitel further testified:

**{¶26}** "A. Uh…we obtained an address, there was a…I believe it was a phone bill and talked to some of the people around at the scene to get a description of the person that fled.  And uh…at that point we had called the sheriff's office and had them go to that address that we had and uh…see if they could make contact with the registered.

**{¶27}** "Q. And who responded from the Sheriff's Office?

**{¶28}** "A. Uh…Deputy Williamson.

**{¶29}** "Q. Okay, and did you go to the house too?

**{¶30}** "A. Yes, I showed up shortly after he did.  He had already arrived.

**{¶31}** "Q. Okay.

{¶32} "A. Um…I was kind of monitoring the traffic…his traffic on the scanner. Um…he said that there was a uh…key in the uh…door.

{¶33} "Q. Now was Deputy Williamson in the house when you arrived?

{¶34} "A. No.

{¶35} "Q. Okay, so he hadn't made entry in to the house?

{¶36} "A. Had not, no.

{¶37} "Q. Okay, so did you…what happened then?

{¶38} "A. Uh…I arrived at the residence and kind of briefed uh…Deputy Williamson on what had taken place. Uh…being concerned for the driver that, you know, with the blood that we saw at the scene uh…with the uh…looking at the vehicles and the impact, uh…we didn't know, you know, if he was in the house or if he wasn't in the house. Uh…and if he was, you know, was he unconscious? You know, what type of injuries did he have? Um…because we have had in the past where, you know, people have uh…died in crashes after, you know, they have been involved in them and uh…heck we have even had them die after they even went to the hospital.

{¶39} "Q. Okay, and based on your training and experience in these kind of crashes, could this have possibly been one of those crashes?

{¶40} "A. It could have, yes.

{¶41} "Q. Now when you approached the door um…Deputy Williamson was with you?

{¶42} "A. Yes.

{¶43} "Q. What…what did you see at this…as far as the condition of the door?

**{¶44}** "A. Uh…the door was uh…I can't remember if it was ajar or not, but uh…I did see the key in the door, uh…and I saw a uh…just a sliver or drop of blood on the uh…around where the handle is…the door.

**{¶45}** "Q. Okay, so what did you do at that point?

**{¶46}** "A. Uh…at that point uh…both Deputy Williamson and I agreed that we should make entry to make sure that, uh…you know, this person wasn't uh…in need of medical attention.

**{¶47}** "Q. Now prior to going into the house uh…did you knock on anything, the door or anything like that to see if anybody would come to the door?

**{¶48}** "A. I believe deputy Williamson had told me he tried to knock and get some type of response.

**{¶49}** "Q. Okay, um…so at that point what did you do?

**{¶50}** "A. Uh…at that point we made entry…well we opened the door and we yelled out for uh…Mr. Wilson and got no…

**{¶51}** "Q. Did you announce who you were?

**{¶52}** "A. Yes.

**{¶53}** "Q. Did anybody come out at that time?

**{¶54}** "A. No.

**{¶55}** "Q. Okay, then…so after uh…you made that announcement what did you do?

**{¶56}** "A. Uh…once we didn't get any response uh…we went ahead and went inside and looked for uh…Mr. Wilson.

{¶57} "Q. And when you uh…did you see any evidence that he may be in the house uh…when you went through the entry of the door?

{¶58} "A. Uh…when we first made Entry there were some shoes up by the door, um…but nothing else at that point no.

{¶59} "Q. Were there any clothes there?

{¶60} "A. Yes, as were talking to uh…after we had made contact with Mr. Wilson there was a uh…some clothes off to the right side of the door um…that were soiled uh…with mud and uh…debris.

{¶61} "Q. Okay, so after you entered the house where did you go?

{¶62} "A. Uh…after we made entry we checked, you know, we wanted to clear the rooms and uh, we went to a back bedroom uh…where we found Mr. Wilson asleep on the bed.

{¶63} "Q. And what did…what was his physical appearance at this time?

{¶64} "A. Uh…he had…when we finally woke him up uh…he had some injuries to his arm, his left arm and he also had an injury up around his head on the left side.

{¶65} "Q. Was he bleeding?

{¶66} "A. Yes."

{¶67} Tr. at 9-12.

{¶68} Deputy Williamson testified:

{¶69} "Q. And, did you arrive at the residence prior to Trooper Eitel?

{¶70} "A Yes.

{¶71} "Q. And when you arrived at the residence what did you do?

{¶72} "A. Uh…I approached the residence, I parked along the road, I approached the residence um…when I arrived at the residence at the front door, the lights were out, um…the storm door was hanging open, the interior door had a key in the doorknob, I knocked several times, like I said there was no lights on in the residence. Um…I knocked several times, no answer, I did try the door handle just to see if it was unlocked and it was obviously…when I shook it, it was obviously unlocked. Um…and I notified my dispatch to notify the post of what I had found and stood by and waited on them.

{¶73} "Q. Okay, now did you enter the residence at that time?

{¶74} "A. Uh…not until Trooper Eitel arrived.

{¶75} "Q. Okay, so you stated that you were knocking on the door. How long do you think you were knocking on the door?

{¶76} "A. Oh a good probably at least 5 minutes.

{¶77} "Q. So when Trooper Eitel arrived what did you do?

{¶78} "A. Uh…once Trooper Eitel arrived uh…we made entry into the house. Uh…we were afraid that there might be somebody from this accident in there that was bleeding or in danger of expiring, so we made entry in to the house, um…announced ourselves numerous times that it was the Sheriff's Office and the State Highway Patrol, um…and checked the residence and subsequently found a gentleman uh…laying in the bed uh…either asleep or passed out.

{¶79} "Q. And did you make any physical observations about him at that time?

{¶80} "A. Uh…yes he had um…a plate of half eaten nachos on his stomach, um…he had some injuries around or about his face.

**{¶81}** "Q. Okay, did he appear to be bleeding?

**{¶82}** "A. Uh…he didn't appear to be actively bleeding, however he had like dried blood on his face."

**{¶83}** Tr. at 29-31.

**{¶84}** Upon review of the record and the testimony set forth above, we find the evidence demonstrates exigent circumstances existed sufficient to justify the warrantless entry into Appellee's residence.  The officers observed significant damage to the vehicle involved in the accident, and a lot of blood at the scene around the driver's area of the vehicle.  Upon arrival to the residence, the officer's observed a small amount of blood on the door knob and the key in the door.  We find the factual circumstances surrounding the entry into Appellee's home justified the officer's entering without a search warrant to ensure Appellee was not in need of medical attention due to injuries sustained in the accident.

**{¶85}** For the foregoing reasons, we reverse the decision of the Licking County Court of Common Pleas and remand the matter to the trial court for further proceedings consistent with this Opinion and the law.

By Hoffman, P. J.

Farmer, J.  and

Edwards, J. concur.

_____
HON. WILLIAM B. HOFFMAN


_____
HON. SHEILA G. FARMER


_____
HON. JULIE A. EDWARDS

IN THE COURT OF APPEALS FOR LICKING COUNTY, OHIO

FIFTH APPELLATE DISTRICT

STATE OF OHIO                              :
                                           :
    Plaintiff-Appellant                    :
                                           :
-vs-                                       :                JUDGMENT ENTRY
                                           :
SHANE WILSON                               :
                                           :
    Defendant-Appellee                     :                Case No. 11-CA-20

For the reasons stated in our accompanying Opinion, the judgment of the Licking County Court of Common Pleas is reversed and the matter remanded to the trial court for further proceedings consistent with this Opinion and the law.  Costs to Appellee.

_____
HON. WILLIAM B. HOFFMAN

_____
HON. SHEILA G. FARMER

_____
HON. JULIE A. EDWARDS